

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/27/2015

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Cody W. Smith, | § | Case No. 12-32096 |
| | § | |
| Debtor. | § | Chapter 7 |
| | § | |

**MEMORANDUM OPINION ON THE CHAPTER 7 TRUSTEE'S ATTEMPT TO
RETAIN AND PAY A MEDIATOR WITHOUT FIRST OBTAINING THIS COURT'S
APPROVAL UNDER 11 U.S.C. § 327(a), FEDERAL RULE OF BANKRUPTCY
PROCEDURE 2014(a), AND THE LOCAL RULES GOVERNING ALTERNATIVE
DISPUTE RESOLUTION**
[Docket No. 332]

## I.  INTRODUCTION

Is a mediator a "professional" under § 327(a) of the Bankruptcy Code[1] whose

employment must first be approved before the mediation can be held?  This Court has found no

case law directly on point.  The Court therefore issues this Memorandum Opinion explaining

why it holds that § 327(a) does encompass mediators.  This Court also issues this opinion for two

additional reasons.  First, the Court wants to emphasize that obtaining *nunc pro tunc* approval of

the employment of a former bankruptcy judge as a mediator is unacceptable because it creates an

appearance of cronyism between the ex-judge and the sitting judge adjudicating the dispute to be

mediated.  Second, the Court wants to emphasize to the practicing bar that this Court's approval

of mediation will never be automatic—even if all parties request it.  Rather, the parties must

convince this Court that mediation is appropriate under all of the circumstances on a case-by-

---

[1] Hereinafter, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted. Further, any reference to "the Rules" refers to the Federal Rules of Bankruptcy Procedure.

case basis. This Opinion will discuss what factors parties must address in seeking an order authorizing mediation.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

The underlying dispute between the instant parties involves the interest of a Chapter 7 debtor, Cody W. Smith (the Debtor), in a limited partnership through which the Debtor and two family members share ownership of a 14,857-acre ranch in Edwards County, Texas (the Ranch) that generates significant cash flow. Upon the Debtor's bankruptcy filing, Lowell T. Cage, the Chapter 7 Trustee (the Trustee), sought to obtain a cash distribution from the partnership. [Doc. No. 294]. The partnership, whose general partner is the Debtor's mother, vigorously objected. [Doc. No. 297].

On September 2, 2014, while this dispute was ongoing, the Trustee filed the Second Joint Emergency Motion of Lowell T. Cage, Trustee, and Wardlaw/Smith, Ltd. to Toll the Time to File Pleadings for Post Judgment Remedies (the Motion). [Docket No. 332]. On September 3, 2014, this Court held a hearing on the Motion. The following individuals made appearances: (1) the Trustee; (2) his general bankruptcy counsel, Timothy J. Wentworth (Wentworth); (3) his special counsel, Stephen W. Lemmon (Lemmon); and (4) James V. Hoeffner (Hoeffner), counsel for the partnership, which is named Wardlaw Smith, Ltd. Prior to the hearing, the Court had reviewed the Motion and noticed that the parties were requesting an order tolling the time to file pleadings until September 25, 2014 because the parties had already scheduled mediation for September 11, 2014 with retired Bankruptcy Judge Leif Clark (ex-Judge Clark) to serve as the mediator.[2] This Court had *not* approved this mediation; indeed, the parties had never mentioned that they were contemplating mediation until the Court saw the reference thereto in the Motion.

---

[2] Ex-Judge Clark served as a bankruptcy judge from 1987 to 2012 in the United States Bankruptcy Court for the Western District of Texas.

During the hearing, the Court inquired as to whether it was the Trustee's intention to use estate funds to pay a portion of the mediator's fee, and counsel for the Trustee responded in the affirmative. The Court also inquired as to whether counsel for the Trustee intended to participate in the mediation, bill time for doing so, and thereafter seek reimbursement from the estate. Counsel for the Trustee once again responded in the affirmative. At this point, the Court orally denied the Motion and told the parties that they could not go forward with the scheduled mediation because they had failed to obtain this Court's prior approval.

This Court will not allow the Trustee in this case—or, for that matter, a trustee in any case—to unilaterally agree to, and direct his attorney to participate in, a mediation for which estate funds will ultimately be requested. Such conduct violates § 327(a) and Rule 2014(a); creates an appearance of impropriety; and deprives this Court of having any input in the Alternative Dispute Resolution process, which violates the Local Rules.[3]

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

1.   <u>Jurisdiction</u>

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it affects the administration of this Chapter 7 estate. Specifically, this dispute concerns the interest that the Trustee asserts with respect to the partnership. The Debtor owned a one-third limited partnership interest in this partnership on the date of the filing of his Chapter 7 petition. The Trustee takes the position that he stands in the shoes of the Debtor and is entitled,

---

[3] Hereinafter, any reference to "the Local Rules" refers to the Local Rules for the United States District Court for the Southern District of Texas. Any reference to "the Bankruptcy Local Rules" refers to the Local Rules for the United States Bankruptcy Court for the Southern District of Texas. The Bankruptcy Local Rules are separate and distinct from the Local Rules, but Bankruptcy Local Rule 1001-1(b) expressly incorporates the Local Rules in the bankruptcy court.

among other things, to distributions from the general partner of Wardlaw Smith, Ltd. The general partner strongly disagrees. The extent of the Trustee's interest in the partnership, and how much in distributions he is entitled to, are matters affecting the Trustee's administration of the Debtor's Chapter 7 estate because every dollar that the Trustee receives from the partnership can be used to pay allowed claims against the estate.

2.   Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1).

3.   Constitutional Authority to Enter a Final Order on the Motion

This Court's ruling does not entail a final order, so the issue of whether this Article I Bankruptcy Court has constitutional authority to issue a final order in the instant dispute under *Stern v. Marshall*, 131 S.Ct. 2594 (2011) does not arise. *See Truong v. Kartzman*, 513 F.3d 91, 93 (3d Cir. 2008) (stating that "an order in an individual adversary proceeding is not final unless it ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment"); *see also In re Fisker Auto. Holdings, Inc.*, No. 14-CV-99, 2014 WL 546036, at *2 (D. Del. Feb. 7, 2014).

**B.   Employment of Mediators by a Bankruptcy Estate Requires Court Approval.**

1.   Under the Bankruptcy Code and Rules, Mediators Are "Professional Persons" Whose Terms of Employment, Including Their Level of Compensation, Must Be Approved Before Mediation Services Are Provided.

This Court prohibited the parties from going forward with their scheduled mediation because the Trustee failed to obtain prior approval to retain ex-Judge Clark as a mediator pursuant to 11 U.S.C. § 327(a). Section 327(a) expressly permits a trustee to hire a professional person, but only with the approval of the bankruptcy court: "the trustee, *with the court's approval*, may employ one or more attorneys, accountants, appraisers, auctioneers, *or other*

4

*professional persons*, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (emphasis added). In conjunction with § 327(a), Rule 2014(a) reiterates that a bankruptcy court must approve employment of professional persons: "An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, *or other professionals* pursuant to § 327 . . . of the Code *shall be made only on application of the trustee* or committee." Fed. R. Bankr. P. 2014(a) (emphasis added).

Commentators are divided on whether mediators are "other professional persons" governed by § 327(a) and Rule 2014(a). *Compare* C.R. "Chip" Bowles, Jr., *Getting Paid: Retention and Compensation in Bankruptcy Cases – A Guide for Non-Attorney Professionals* 7 (2010) (stating that courts have found mediators to be professionals under § 327(a)), *and* Lisa A. Lomax, *Alternative Dispute Resolution in Bankruptcy: Rule 9019 and Bankruptcy Mediation Programs*, 68 Am. Bankr. L.J. 55, 85 (1994) (stating that "mediators are implicitly addressed" by § 327(a) and other provisions related to professionals), *with* 8 Norton Bankr. L. & Prac. 3d § 168:4 ("The mediator is not a professional in the sense provided for under Code § 327(a).").

The Code does not define "professional persons," but boundaries have developed in the case law. Generally, to qualify as a "professional person" under § 327(a), a person must be a professional in the ordinary sense of the word—that is, a person must perform high-level, specialized services requiring "discretion or autonomy." *In re Semenza*, 121 B.R. 56, 57 (Bankr. D. Mont. 1990). For example, paralegals are not professionals. *Id.* at 58. However, "not all individuals normally considered as professionals will be deemed professionals for purposes of Section 327." *U.S. ex rel. Kraft v. Aetna Cas. & Sur. Co.*, 43 B.R. 119, 121 (M.D. Tenn. 1984). Section 327(a) requires the professional "to represent or assist the trustee in carrying out the trustee's duties under this title." Therefore, courts have required that the professional

5

person's employment must specifically relate to the administration of the bankruptcy case, as opposed to the ordinary course operation of the debtor's business. *Matter of Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981). In *Seatrain*, maritime engineers who were not specifically employed to reorganize the debtor but were retained in connection with its day-to-day operations were not "professional persons." *Id.*

Furthermore, a professional must utilize his professional skills to impact the administration of the estate. The significance of the professional's task and the amount of discretion the professional has in performing it may be combined as factors to determine the overall importance of the professional's services. *See, e.g., In re Fretheim*, 102 B.R. 298, 299 (Bankr. D. Conn. 1989). An expert witness, for example, who is not in a position to exercise discretion over matters central to the administration of the estate, is not a professional person. *See, e.g., In re Cyrus II P'ship*, No. 05-39857, 2008 WL 3003824, at *5 (Bankr. S.D. Tex. July 31, 2008).

In light of these considerations, this Court concludes that mediators should be governed by the provisions of the Code and Rules regulating employment of professional persons. Mediators dealing with disputes in bankruptcy are professionals in the ordinary sense of the word, as they are usually attorneys with a highly specialized skill set. Mediators who are engaged to resolve bankruptcy disputes are by definition playing a central role in those disputes, far removed from the role of, for example, a paralegal or an expert witness. Under a balancing approach, this Court finds that the substantial discretion a mediator has in helping to resolve a bankruptcy dispute is sufficiently significant to the overall administration of the estate to require court approval under § 327(a) and Rule 2014(a). Although this Court could not locate any cases directly addressing the question of whether a mediator is a "professional person," it did locate

6

multiple standing orders from bankruptcy courts throughout the country that require an estate representative to obtain approval before employing a mediator.[4]  Thus, impliedly, some courts have concluded that a mediator is a "professional" whose employment is governed by § 327(a) and Rule 2014(a).

The case at bar illustrates why mediators should be treated as professional persons under § 327(a) and Rule 2014(a).  Ex-Judge Clark is a consummate bankruptcy professional, and as a mediator in the instant dispute, he would have had substantial discretion over a very important and high-dollar issue central to the administration of the Debtor's Chapter 7 case (i.e. whether the Debtor was owed distributions from the Ranch).  Ex-Judge Clark was in no way involved in the Debtor's routine business operations or the partnership's daily operation of the Ranch.  Therefore, he, in his capacity as a mediator, qualifies as a "professional person."  Yet, the Trustee never filed any application to employ ex-Judge Clark as a mediator.  Thus, the Trustee intended to go forward with the mediation scheduled for September 11, 2014 without any order from this Court approving either ex-Judge Clark as the mediator or his level of compensation (whatever his fee was going to be, which was never disclosed to the Court).  If the Trustee had gone forward with the mediation, he would have been in violation of § 327(a) and Rule 2014(a).[5]

---

[4] *See* Amended Standing Order 09-04: Mediation List (Bankr. D. Mass. 2010) ("In the event that one of the Parties is an estate representative, the estate representative shall seek leave from the Court, in advance, to submit the dispute to mediation and to retain and compensate the Mediator pursuant to the provisions of 11 U.S.C. § 327 and Federal Rule 2014 and Local Rule 2014-1."); Voluntary Mediation Program and Procedural Requirements (Bankr. W.D. La. 2005) ("In any Mediation in which a bankruptcy estate is a party, compliance with 11 U.S.C. §327 is required."); Voluntary Mediation Procedural Requirements (Bankr. E.D. Wash. 2000) ("If the bankruptcy estate is a party, the party representing the estate is responsible to get the necessary authority required by 11 U.S.C. 327.").

[5] It is worth noting that the Trustee would also have been violating § 363(b) if, without an order from this Court, he had used estate funds to pay all or any portion of ex-Judge Clark's fee for his mediation services.  This is so because § 363(b) prohibits a trustee from using estate property other than in the "ordinary course of business" and case law is clear that payments of litigation expenses are not "ordinary course" payments."  *See In re Fid. Standard Mortg. Corp.*, 839 F.2d 1517, 1522 (11th Cir. 1988) (holding that the payment of a settlement from estate funds is not within the ordinary course under § 363(b)); *Hickey v. Nightingale Roofing, Inc.*, 83 B.R. 180, 185 (D. Mass. 1988) (establishing a *per se* rule that transfers pursuant to litigation settlements are not "ordinary course" under the exception to preferences in § 547(c)); *In re McDonald Bros. Const., Inc.*, 114 B.R. 989, 994 (Bankr. N.D. Ill. 1990)

Furthermore, the policy behind § 327(a) supports treating mediators as "professional persons." The primary purpose of § 327(a) is to "contain the estate's expenses and avoid intervention by unnecessary participants." *In re Garden Ridge Corp.*, 326 B.R. 278, 280 (Bankr. D. Del. 2005). The attorneys of record in this dispute—Hoeffner, Lemmon, and Wentworth— are seasoned trial lawyers with substantial experience in bankruptcy, each of whom has been practicing for more than 25 years. They are also first-rate counselors at law who have the courage and temperament to look their respective clients in the eye and tell them the risks of losing at trial, the risks of losing on appeal, and whether settlement offers on the table fall within the range of reasonableness given the risks of continuing to litigate. They are equally capable of devising and recommending settlement and counter-settlement offers to their clients. Finally, Hoeffner, Lemmon, and Wentworth are consummate professionals who have been on excellent speaking terms with one another as lawyers. Indeed, throughout this Chapter 7 case, they have been models of how to be warriors in the courtroom zealously representing their clients, but nevertheless being polite and professional. Under these circumstances, this Court sees no reason why the Trustee should use estate funds to pay a mediator—as well as his counsel to participate in that mediation—when the lawyers involved in this dispute have the negotiating skills, brainpower, and demeanor that Hoeffner, Lemmon, and Wentworth in fact possess. Rather, it

---

(stating that "a debtor in possession who transferred estate funds to a professional without court order would violate Section 363(b)" because "the employment of bankruptcy professionals would presumably not be in the ordinary course of business"). However, based upon a comment made by Lemmon (the Trustee's special counsel) at the September 3, 2014 hearing, the Court is aware that the Trustee was not going to use estate funds to pay the mediation fee on or before the mediation that the parties had scheduled for September 11, 2014. Rather, Lemmon's law firm was going to pay the Trustee's portion of the fee, and then Lemmon—when subsequently filing his firm's fee application—was going to seek approval from this Court for the Trustee to use estate funds to reimburse his firm for the amount it paid to ex-Judge Clark (with the Trustee supporting this request). While this approach certainly ensured that the Trustee was not going to violate § 363(b), it nevertheless underscores that the Trustee had every intention of ultimately using estate funds to pay a mediation fee without first obtaining this Court's approval of ex-Judge Clark as the mediator and of the amount of the fee to be paid to him.

makes more economic sense for these three lawyers to continue communicating with each other without any mediator.

    2.    <u>Even if mediators are not "professional persons" whose terms of employment are subject to approval under § 327(a) and Rule 2014(a), if the proposed mediator is an ex-bankruptcy judge, then prior court approval is still necessary.</u>

Even if all mediators are not considered *per se* "professional persons" under § 327(a), this Court finds that the protections of § 327(a) and Rule 2014(a) should apply to proposed mediators who are ex-judicial colleagues of the sitting bankruptcy judge. Bankruptcy judges have the power to "tak[e] any action . . . to prevent an abuse of process." 11 U.S.C. § 105(a). This Court finds that to prevent any abuse of the process of selection of ex-bankruptcy judges as mediators—*including the appearance of an abuse of this selection process*—it is necessary to use its § 105(a) powers and apply § 327(a) when a proposed mediator is a former judicial colleague of the sitting judge.

This Court invokes its § 105(a) powers pursuant to the Supreme Court's holding in *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007). There, the Supreme Court held that even where there exists an unqualified right under the Code, such a right is subject to an exception where there has been an abuse of process. The Code provision in dispute was § 706(a), which unambiguously states that a Chapter 7 debtor "may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable." In *Marrama*, the Chapter 7 debtor moved to convert his case to a Chapter 13, and his pending Chapter 7 case had never previously been converted under § 1112, 1208, or 1307. Accordingly, under a plain reading of § 706(a), the debtor had an absolute right to convert to Chapter 13. The Supreme Court held otherwise.

Noting that the debtor had committed pre-petition misconduct, the Court held that the right to convert was not absolute despite the unambiguous language of § 706(a), and that the bankruptcy court, using its § 105(a) powers, could deny the debtor's request to convert. *Id.* at 374–75. Thus *past* misconduct was grounds for the bankruptcy court to use its § 105(a) powers to prevent *future* abuse of process. If *Marrama* allows a bankruptcy court to use its § 105(a) powers to deny an unambiguous right under the Code in order to prevent an abuse of process, then surely *Marrama* allows this Court to use its § 105(a) powers to stop abuse involving a Code provision (i.e. § 327(a)) that is ambiguous as to whether a mediator is a "professional person." Here, for the reasons stated below, this Court finds that to prevent the abuse of—including *the appearance of abuse of*—selecting ex-bankruptcy judges as mediators, it is necessary to apply § 327(a) and Rule 2014(a).

Section 327(a) protects the bankruptcy estate against administrative involvement by actors who have questionable interests in order to ensure that no one questions the integrity of the selection of, and use of estate funds to pay fees to, these actors. The undersigned judge and ex-Judge Clark served on the bankruptcy bench in Texas for eight years until the latter's retirement in late 2012. Under these circumstances, it would amount to an abuse of process, or at least an appearance of abuse of process, for the undersigned judge, having learned that ex-Judge Clark would be serving as a mediator, to allow the mediation to go forward without first holding a hearing under § 327(a)—or, for that matter, to allow the mediation to first be held and thereafter hold a hearing to approve ex-Judge Clark on a *nunc pro tunc* basis.

The history of the Bankruptcy Reform Act of 1978, which enacted § 327(a) as part of the present Bankruptcy Code, reveals why such a result would frustrate the purpose of the provision. Shortly after the modern U.S. bankruptcy system emerged with the Bankruptcy Act of 1898 (the

Bankruptcy Act), the practice began to develop a reputation for incestuousness and cronyism. Linda Coco, *Stigma, Prestige and the Cultural Context of Debt*, 16 Mich. J. Race & L. 181, 213 (2011). The specialized nature of the field and the relatively informal status of bankruptcy judges (known then as bankruptcy referees) cultivated an insider-dominated atmosphere. *Id.* at 213–14. The practice was essentially controlled by "bankruptcy rings," closely knit groups of professionals who would appoint each other for every role in a bankruptcy case. *Id.* This insularity bred a perception of the bankruptcy practice as exploitative and unprincipled. *Id.* at 214.

Widespread criticism of the shortcomings of the bankruptcy system motivated Congress to create the Bankruptcy Commission in 1970 to explore possibilities of reform. Bruce C. Carruthers & Terence C. Halliday, *Professionals in Systemic Reform of Bankruptcy Law*, 74 Am. Bankr. L.J. 35, 44 (2000); Frank R. Kennedy, *The Report of the Bankruptcy Commission*, 49 Ind. L.J. 422, 422 (1974). The resulting legislation, the Bankruptcy Reform Act of 1978, sought to distance bankruptcy referees from trustees by creating the first iteration of the network of United States Trustees (USTs) that oversee the bankruptcy system today. *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1529 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995). Congress's impression was that the administrative duties that bankruptcy referees had relating to estate administration created an inherent risk of bias and consequent "potential for fraud, for self-dealing, and for diversion of funds." H.R. Rep. No. 95-595, at 88 (1977). The hope was that transferring appointment power from judges to USTs would end a "patronage" system under which bankruptcy judges often appointed friends and former colleagues and law partners as trustees and awarded them the maximum allowable fees regardless of effort. *Id.* at 92–95. The

pilot UST program was so successful that Congress converted it to a permanent system in 1986. *St. Angelo*, 38 F.3d at 1529.

Under the present system, the balance of administrative responsibility between bankruptcy judges and trustees (whom the UST appoints) is intended to check overreaching by both. Section 327(a) illustrates the multilevel operation of this system. First, it empowers judges to check trustees' power to appoint professionals by giving judges final authority to approve or deny employment applications. Second, it checks both judges' and trustees' power of appointment by ensuring that all professionals meet certain procedural and substantive requirements—including a requirement that the professional be "disinterested," which curbs, among other vices, cronyism. 11 U.S.C. § 327(a). As defined in the Code, the term "disinterested person" means a person who, *inter alia*, is not an "insider." 11 U.S.C. § 101(14)(A). Here, ex-Judge Clark is the ultimate insider, as he sat on the bankruptcy bench for 25 years and is an ex-colleague of the undersigned judge.[6]

Allowing sitting judges to preside over cases knowing that their former judicial colleagues will serve as mediators, and earn fees for doing so, without the procedural requirements of § 327(a) would eliminate the protection against judicial overreaching. Removing this protection could create a new opportunity for sitting judges to bestow favored positions on friends and former colleagues, evoking the incestuous referee-trustee relationship rampant under the old Bankruptcy Act. And, as importantly, even if the sitting judge has had nothing to do with the selection of a former colleague as the mediator (as was true in the case at

---

[6] The term "insider" is defined in § 101(31). While the definition focuses on the subject's relationship to the debtor, the definition expressly uses the word "including"—which means that the definition does not limit the focus to the subject's relationship to the debtor. *See* § 102(3) setting forth that "'includes' and 'including' are not limiting." Here, ex-Judge Clark has no relationship to the Debtor, but he has a high profile relationship with the bankruptcy system in general and the undersigned judge in particular by virtue of having served on the bankruptcy bench for 25 years. This status makes him, to unsecured creditors concerned about estate funds being used for purposes other than paying their claims, as much of an insider as any person or entity affiliated with the Debtor.

bar), an *appearance* of cronyism is created: any unsecured creditors hoping to receive even pennies on the dollar for their claims would justifiably be concerned that the premium price the trustee is paying for the ex-judge to serve as the mediator will necessarily mean that fewer dollars, if any dollars, will be distributed to them.

Additionally, as a protection against cronyism in the appointment of professionals, Rule 2013 requires the clerks of court to keep public records of all professional compensation. The advisory committee notes to Rule 2013 shed more light on Congress's intent:

> A basic purpose of the rule is to prevent what Congress has defined as "cronyism." Appointment or employment, whether in a chapter 7 or 11 case, should not center among a small select group of individuals unless the circumstances are such that it would be warranted. The public record of appointments to be kept by the clerk will provide a means for monitoring the appointment process. . . .
> [P]ublic recognition of appointments, fairly distributed and based on professional qualifications and expertise, will be promoted and notions of improper favor dispelled. This rule is in keeping with the findings of the Congressional subcommittees . . . . that there were frequent appointments of the same person, contacts developed between the bankruptcy bar and the courts, and an unusually close relationship between the bar and the judges developed over the years. A major purpose of the new statute is to dilute these practices and instill greater public confidence in the system. Rule 2013 implements that laudatory purpose.

Fed. R. Bankr. P. 2013 advisory committee's note. As another bankruptcy court has noted, "Rule 2013 makes clear that public policy favors sunshine." *In re Scoggins*, 517 B.R. 206, 220 n.11 (Bankr. E.D. Cal. 2014).

The instant case provides a prime example of the risk and appearance of "cronyism." The undersigned judge and ex-Judge Clark were long-time colleagues in the innermost circle of the bankruptcy profession. Not only did they serve on the bench together for many years, they are presently fellows in the American College of Bankruptcy; they have made presentations together at continuing legal education conferences; and they have worked together to coach teams who have participated in the Duberstein Bankruptcy National Moot Court Competition

and the Elliott Cup Bankruptcy Moot Court Competition in the Fifth Circuit. It is exactly this type of close collegial relationship between consummate bankruptcy insiders that gave rise to the "bankruptcy rings" so prevalent under the Bankruptcy Act. If the undersigned judge were to allow ex-Judge Clark's employment without the protections of § 327(a) and related provisions, it would reopen the door—at least in appearance—to the cronyism that the Bankruptcy Reform Act was designed to prevent. Indeed, the parties in the case at bar never disclosed the fee that they intended to pay ex-Judge Clark for his mediation services, which means that they were putting the undersigned judge in the position of essentially blessing a mediation conducted by a former colleague without knowing what the size of his fee would be or what portion of that fee would be paid from estate funds. Therefore, this Court finds that when a proposed mediator is an ex-bankruptcy judge who served at the same time as the sitting bankruptcy judge, then that ex-judge (and his mediation fee) must first be approved under § 327(a) before the mediation is held. A hearing must be held vetting the ex-judge's relationship with the sitting judge so that the creditors in the case have an opportunity to object and, additionally, even if there is no objection, so that the sun shines brightly on the appointment in the event anyone subsequently questions the selection of the ex-judge and use of estate funds to pay his fee. In cowboy parlance, the process of selecting an ex-judge as a mediator must be "clean as a hound's tooth."

3.  Bankruptcy Local Rule 2014-1(b)(1) Cannot Be Used to Avoid Pre-employment Approval of Mediators.

In the case at bar, it is entirely possible that the Trustee intended to go forward with the mediation and then, after it was completed, file an application to employ ex-Judge Clark as the mediator on a *nunc pro tunc* (retroactive) basis. Bankruptcy Local Rule 2014-1(b)(1) allows a trustee to obtain *nunc pro tunc* approval of a "professional person" if the application to approve the employment and terms of compensation is filed within 30 days of the commencement of that

14

person's provision of services.[7]   However, the Court concludes that this rule is inappropriate as applied to mediators.   Therefore, pursuant to Bankruptcy Local Rule 1001-1(d), which allows a judge to "modify the application of the rules in any case," the undersigned judge will not allow practitioners to invoke Bankruptcy Local Rule 2014-1(b)(1) with respect to the appointment of mediators.

Bankruptcy Local Rule 2014-1(b)(1) is inappropriate for mediator appointments because these appointments do not involve the circumstances that this particular rule was designed to address.   In the mediator context, the rule's primary drawback—that it greatly reduces the presiding bankruptcy judge's range of options regarding professionals—outweighs the rule's benefit.

Bankruptcy Local Rule 2014-1(b)(1) has typically been used to allow attorneys for debtors-in-possession and trustees up to 30 days to file their applications to employ their law firms[8] so that these attorneys can devote their full time to dealing with the emergencies that arise at the outset of a case (such as "first day" motions seeking approval to use cash collateral). Arranging a mediation does not involve any such exigencies.   There is no reason, therefore, that counsel cannot proceed according to the ordinary application process for employing a mediator. The flexibility created by Bankruptcy Local Rule 2014-1(b)(1) entails a trade-off: it presents the presiding bankruptcy judge with a stark choice of retroactively approving or rejecting work (and

---

[7] Local Rule 2014-1(b)(1), which is entitled *Nunc pro tunc* Application, reads as follows: "If an application for approval of the employment is made within 30 days of the commencement of that professional's provision of service, it is deemed contemporaneous."   If a trustee files an application to employ beyond the 30th day, then the requirements for obtaining approval are very stringent.   *See In re Triangle Chemicals, Inc.*, 697 F.2d 1280, 1289 (5th Cir. 1983) ("We only hold that, where *through oversight* the attorney has neglected to obtain such prior approval [for his or her employment] but has continued to perform services for the debtor/debtor in possession . . . , the bankruptcy court retains equitable power . . . , *under exceptional circumstances*, to grant such approval *nunc pro tunc*, upon proper showing . . . .") (emphasis added).

[8] It is the debtor-in-possession or trustee who signs the application to employ their lawyers, but in most instances, it is the lawyers who actually draft the application.

the fee associated with the work) that has already been performed. By contrast, when a judge has the opportunity to review an application to employ in advance, the judge may reject the application with leave to resubmit it with an amended fee proposal or scope of employment, or with receptivity to the application of a different professional. Preserving the judge's full range of options enables the judge to ensure that estates employ professionals only on terms beneficial to the estate and that are not inimical to the integrity of the bankruptcy system. Conversely, when a judge is limited to considering applications retroactively, any damage to the estate in particular (due to subpar professional services) or the bankruptcy system in general (due to cronyism) is a *fait accompli*.

Not only could poor quality mediation harm a bankruptcy estate, but retroactive approval of mediators could waste the estate's financial resources. Professionals employed under § 327(a) may thereafter apply to be compensated from estate funds, which was contemplated in the instant case. [Hearing of September 3, 2014, at 3:05 p.m.]. The presiding judge can, of course, choose to deny, or partially deny, the professional's *nunc pro tunc* application to be compensated from estate funds. But not only can this option *not* impact the services that the professional has by that time already performed, it creates pressure on the presiding judge to approve fees that does not exist pre-employment. Conversely, before work is performed, a judge can curtail the professional's scope of services without necessarily harming the professional financially. After services are performed, any fee the judge denies is a fee the professional has claimed to have earned. Especially when the mediator is a former colleague of the judge, the circumstances could create pressure for the presiding judge to approve unnecessary, or unnecessarily expensive, professional services. Under these circumstances, the undersigned judge finds that the risk of

16

harm, to the estate in particular, and the bankruptcy system in general, of invoking Bankruptcy Local Rule 2014-1(b)(1) is not justifiable in the mediator context.

Fortunately, Bankruptcy Local Rule 1001-1(d), which grants judges the ability to "modify the application of the rules in any case," allows the undersigned judge to bar the use of Bankruptcy Local Rule 2014-1(b)(1) to employ mediators *nunc pro tunc*. Accordingly, the undersigned judge now invokes Bankruptcy Local Rule 1001-1(d) to prohibit the use of Bankruptcy Local Rule 2014-1(b)(1) with respect to employing mediators on a *nunc pro tunc* basis. Trustees (or debtors-in-possession) who want the undersigned judge's approval to employ a mediator must file the application to employ and obtain an order granting the application *before* the mediation actually occurs.

**C.    Local Rules Governing Mediation Do Not Require this Court to Allow the Parties to Mediate, but Rather Give this Court a Gate-keeping Role to Determine Whether Mediation Is Appropriate.**

1.    Review of the Local Rules

Even if the Trustee in the case at bar had, prior to scheduling any mediation, filed an application to employ under § 327(a) and Rule 2014(a) setting forth that he wanted to engage ex-Judge Clark as a mediator, this Court would not have rubber-stamped an order approving the requested relief. Before issuing a ruling, the Court would have wanted more information than merely knowing that the Trustee wanted to engage ex-Judge Clark.

The undersigned judge is keenly aware that pursuant to 28 U.S.C. §§ 651(b) and 652(a), the Local Rules adopt an Alternative Dispute Resolution (ADR) Program, which encompasses mediation. Local Rule 16.4.A.[9] The ADR Program described in the Local Rules applies to

---

[9] Local Rule 16.4.A is a rule set forth only in the District Court Local Rules. However, Bankruptcy Local Rule 1001-1(b) sets forth that "[i]n addition to these rules, the Local Rules of the District Court . . . and the standing and general orders govern practice in the bankruptcy court." Therefore, Local Rule 16.4.A applies in this Bankruptcy Court.

"civil cases pending before district, magistrate, and bankruptcy judges." *Id.* Because the Local Rules for ADR specifically apply to "all civil actions, including adversary proceedings in bankruptcy," these rules arguably do *not* apply to *contested matters* in a bankruptcy, such as the dispute at bar. Nevertheless, assuming the Local Rules for ADR apply to the instant contested matter,[10] they do not require the undersigned judge to authorize mediation.

Under the Local Rules, counsel are required to discuss with their clients and with opposing counsel the appropriateness of ADR before the initial pretrial conference in court. Local Rule 16.4.B. The parties must advise the judge of the results of their discussions concerning ADR at the initial pretrial conference, at which time the judge will explore with the parties the possibility of using ADR. *Id.* In the case at bar, the parties clearly discussed between themselves the appropriateness of ADR, but they never advised this Court of the results of their discussions (other than to mention in the Motion that they were going to mediate on September 14, 2014), nor did they give the Court the opportunity to voice its views. This, the Court now does.

2.   The Factors this Court Considers in Determining Whether to Approve Mediation

Before approving a mediation and use of estate funds to pay the mediator (and also a trustee's attorney whenever he/she files a fee application), this Court considers several factors. First, when a dispute lands in bankruptcy court, the attorneys need, at a minimum, to conduct some discovery and initiate settlement discussions with their clients and opposing counsel. Indeed, for counsel to advise clients about settlement offers and counteroffers effectively, it is

---

[10] The undersigned judge is aware of several instances where courts have authorized mediation in disputes involving proposed cram down plans. *See, e.g.*, Order Continuing Mediation, *In Re ASARCO, LLC*, No. 05-21207 (Bankr. S.D. Tex. Nov. 17, 2008), ECF. No. 10015. Plan confirmation disputes are "contested matters." *See, e.g.*, *In re Patriot Place, Ltd.*, 486 B.R. 773, 812 (Bankr. W.D. Tex. 2013) (referring to a dispute over confirmation of a Chapter 11 plan as a "contested matter"). Therefore, this Court will assume that the Local Rules for ADR apply just as equally to contested matters in bankruptcy (such as the contested matter at bar) as they do to adversary proceedings.

generally necessary to ferret out facts from discovery and discussions in order to assess the strengths and weaknesses of the respective clients' cases. Thus, before approving mediation, this Court wants to know how much discovery the parties have conducted and whether this discovery has resulted in substantive settlement discussions. This is because parties should only pursue mediation after first attempting to reach a settlement without third-party intervention.

Even if discovery and discussions have been conducted—but no settlement is reached—mediation is not necessarily appropriate. Mediation is not free. The parties must pay not only the mediator, but also their respective counsel for participating in the mediation, which typically includes drafting a client position letter for the mediator and preparing for any oral presentation to be made at the mediation. Before undergoing a mediation, these costs should be weighed against the costs of simply going forward with a hearing or trial. Merely because the monetary costs of litigation outweigh the costs of mediation, however, does not necessarily mean that this Court will approve mediation.

There are also psychological, in addition to monetary, costs that should be considered in determining whether to approve mediation. And the psychological costs of mediation may outweigh the monetary costs of litigation. Some clients do not want to be forced into mediation; rather, they simply want their day in court because they want vindication from a judge that their actions were legal, or at least not illegal.[11] For example, a president of a small bank in a rural community who has been accused of forging a debtor's signature on a renewal note may well

---

[11] There is little doubt that trials—i.e. having one's day in court—have markedly decreased in recent years. *See generally* Kimberlee K. Kovach, *The Vanishing Trial*, 7 Cardozo J. Conflict Resol. 27 (2005). While there are no studies definitively linking the increase in mediation to the decline in trials, it is eminently reasonable to conclude that there is a nexus. *See id.* ("The use of ADR has also been suggested as a cause for the decrease in trials. In examining the disposition of court cases, ADR, and in particular mediation, has had an impact. While statistics have not demonstrated a direct correlation between mediation and the settlement of additional cases, it is certainly responsible for earlier resolution."). Thus, forcing a party who wants his/her day in court to mediate rather than proceeding directly to the courtroom can indeed deprive this party of his/her day in court—particularly if the party settles at mediation out of the belief that he/she will never be given the opportunity to actually gain access to the courtroom.

want to go forward with trial and try to obtain a judgment that he did not commit forgery so as to preserve his reputation in the community (in addition to his bankruptcy claim). Sending the parties to mediation in such a circumstance undermines the integrity of the legal system because the parties—or at least the party who wants his day in court—concludes that the presiding judge is either too lazy or too scared to adjudicate the dispute on the merits.

Fear of trial *by the attorney* is another factor to consider in determining whether mediation should ensue. Some attorneys who are not experienced in actually trying disputes in the courtroom push their clients into mediation by explicitly—and incorrectly—telling them that the judge insists that the parties undergo mediation or that the local rules require mediation. The clients, particularly those who are unsophisticated, accept these statements without challenge and agree to mediation regardless of their desire to have their day in court. Authorizing mediation under these circumstances is inappropriate. Doing so promotes deception of clients and erodes a fundamental premise of the American legal system: the development of lawyers who know how to examine witnesses and introduce evidence in the courtroom.

Another factor to consider is whether the attorneys for the parties are able to communicate with each other as well as with their own clients. Certainly, it is difficult to conduct settlement negotiations if the relationships among counsel are so acrimonious that effective communications are impossible, or if the attorneys' ability to confer effectively with their own clients is compromised. Stated differently, the narrower the channel of communications between attorneys and clients, the more appropriate it is to mediate.

The final factor to consider is the importance of having a hearing (or trial) so that one party will win and the other will lose. The losing party, by learning a hard lesson in the courtroom—including how unpleasant it can be to undergo cross-examination by opposing

counsel—may stop behaving in the manner that created the dispute in the first place. However, if that same party does not lose in the courtroom, but rather settles at a mediation (without the embarrassment and sting that can come with a courtroom loss), the party is more likely to continue the same behavior and foment future disputes similar to the one that has settled in mediation. Thus, in certain instances, it is appropriate for a court to deny mediation in the interest of pushing a "winner take all" scenario.

In sum, the undersigned judge, when deciding whether to enter an order allowing parties to mediate and estate funds to be used therefor, wants parties seeking mediation to file a motion discussing, at a minimum, the following factors:

1) *The subject matter of the dispute.*

2) *The amount of discovery completed.*

3) *The amount of time the attorneys have spent discussing settlement with their respective clients and whether the lines of communication with the clients have been open.*

4) *The amount of time the attorneys have spent discussing settlement with opposing counsel, whether the lines of communication have been open, and whether any progress has been made towards a resolution.*

5) *The actual courtroom experience of the attorneys in adducing testimony and introducing exhibits.*

6) *Whether the attorneys have explained the mediation process to their respective clients and reviewed with them the costs of mediation versus the costs of simply going forward with the scheduled hearing or trial.*

7) *The name, qualifications, and fee of the proposed mediator.*

8) *The estimated cost for each client of the mediation (i.e. the client's share of the mediator's fee, the attorney's fees for representing the client in the mediation, and any travel or other associated costs).*

9) *The percentage of the estimated cost to the estate (i.e. the estate's portion of the mediator's fee, plus attorneys' fees associated with the mediation, plus costs of lodging and travel, if any) to the actual amount of cash presently in the estate.*

*10) Whether any of the parties are opposed to mediation because they want their day in court as soon as possible.*

After reviewing any motion for mediation that addresses these points—and any other points that the parties believe are germane—this Court may issue a ruling from chambers or may schedule a hearing. If the latter, the Court may require the parties to attend the hearing with their respective counsel, and the Court may ask the parties to give testimony that they understand the mediation process, agree to the associated costs, and do indeed want to proceed with mediation instead of going forward with the hearing or trial.

3.   Application of These Factors to the Dispute at Bar

In the case at bar, the parties never filed a motion requesting approval from this Court to mediate, to approve ex-Judge Clark (and his proposed fee) as the mediator, or to approve payment of his fee with estate funds. Indeed, no disclosure of the amount of his fee was ever made.[12] The parties simply filed a motion to toll the time to file pleadings and, in one paragraph, mentioned that they were about to mediate with ex-Judge Clark. This approach will not suffice.

Even if the Trustee and the partnership had filed a motion to request mediation, this Court, in assessing the ten factors discussed above, would not have approved the request. Granted, the parties had conducted some discovery, so there was one factor favoring mediation. However, as discussed *supra*, Hoeffner, Wentworth, and Lemmon are all seasoned trial lawyers who have given the Court every indication that they are capable of reaching a settlement in the instant dispute without incurring the additional expense of a mediator. Indeed, these attorneys

---

[12] Aside from such non-disclosure violating the Code and the Rules, the failure to disclose the amount of the fee also ran afoul of Local Rule 16.4.G, which reads as follows: "The provider and the parties generally will determine the fees for each ADR proceeding. *However, the judge presiding over a case has the right to review the reasonableness of fees and to adjust them as appropriate.*" (emphasis added).

have been communicating very well with their respective clients and with each other. A mediation is typically worth trying when these conditions do *not* exist.

While the Local Rules may be characterized as mediation-friendly, they do not strip this Court of the authority to refuse to permit mediation. Local Rule 16.4.C specifically allows a judge to deny a request to mediate:

> If the parties agree upon an ADR method or provider, the judge will respect the parties' agreement *unless the judge believes another ADR method or provider is better suited to the case and parties. The authority to refer a case to ADR does not preclude the judge from suggesting or requiring other settlement initiatives.*

Local Rule 16.4.C (emphasis added). At the hearing on September 3, 2014, when this Court told the parties not to go forward with their scheduled mediation, the Court's comments on the record were intended to suggest "other settlement initiatives"—namely, that the parties themselves should continue to negotiate. Subsequently, the parties and their attorneys continued to conduct settlement discussions, and, after further negotiations, arrived at a detailed, imaginative, and economically sensible settlement—which this Court thereafter approved after notice and hearing (no objections were lodged to the settlement). [Doc. No. 367]. Thus, the "other settlement initiatives" were successful.

In sum, the undersigned judge does not belong to the school of "mediation romantics" who believe that mediation best resolves all disputes and leaves all the parties walking away with warm and fuzzy feelings towards one another. Accordingly, the undersigned judge will rule on each application for mediation based upon the ten factors discussed herein rather than routinely rubber-stamp orders approving each mediation request under the philosophy that this method is a panacea for resolving all disputes that erupt in this Court.

IV.   CONCLUSION

Rule 1 provides that the bankruptcy rules "shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding."   There is little doubt that mediation can sometimes achieve this objective.  Mediation assuredly has its place.

But mediation should not be so commonplace that it occurs in violation of the Code and Rules, deprives parties of timely having their day in court, or takes place because the attorneys (as opposed to their clients) fear the courtroom.  Mediation under these circumstances might well produce a speedy and less expensive resolution, but such a resolution would not be *just*.  For these reasons, the undersigned judge wants parties desirous of mediation to file a motion discussing the factors articulated in this Opinion.  The undersigned judge, before approving mediation and authorizing use of estate funds to pay for this process, wants to ensure—as much as possible—that all three requirements of Rule 1 can be satisfied.

Two orders consistent with this Opinion have already been entered on the docket. One is the order denying the Motion [Doc. No. 333].  The other is the Order Granting Motion to Approve Compromise under Rule 9019 [Doc. No. 367]—a settlement obtained, the Court notes, without mediation.

Signed this 27th day of January, 2015.

Jeff Bohm
Chief United States Bankruptcy Judge